# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

JOHN DOE, by and through JANE DOE, Guardian,

Plaintiff,

v.                          Civil Action No. 25-cv-04564 (JEB)

OPENAI, L.P., et al.,

Defendants.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**PLAINTIFF'S THIRD SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO VACATE DISMISSAL ORDER: CLARIFYING THE LEGAL FUNCTION, MEANING, AND STRATEGIC EFFECT OF THE NATURE SCIENTIFIC REPORTS STUDY AT SCREENING AND BEYOND**

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**PRELIMINARY STATEMENT**

RECEIVED

MAR 10 2026

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

1

Plaintiff John Doe, by and through Guardian Jane Doe, respectfully submits this Third
Supplemental Brief in further support of Plaintiff's pending Motion to Vacate the January 29,
2026 Dismissal Order pursuant to **Federal Rules of Civil Procedure 60(b)(1)** and **60(b)(6)**,
which has not yet been decided by this Court, so that the Court may consider this additional legal
analysis before ruling. **See Fed. R. Civ. P. 60(b)(1), (6).**

Plaintiff's Second Supplemental Brief presented a peer-reviewed study published in **Nature
Scientific Reports** on December 25, 2025 — **Mapping the Technological Evolution of
Generative AI: A Patent Network Analysis**, Nature Scientific Reports (Dec. 25, 2025),
https://doi.org/10.1038/s41598-025-26810-7 —  which analyzed 172,489 global generative AI
patents spanning the entire history of the field from 1986 through 2025, and confirmed that 2018
constitutes the documented inflection point when integrated generative AI emerged as an
industry category.

This Third Supplemental Brief serves three discrete purposes. First, it clarifies the precise legal
function of the **Nature** study — specifically, that Plaintiff does not offer the study to establish
copying, access, or any dissemination path, and that no such showing is required at the screening
stage under **28 U.S.C. § 1915(e)(2)(B)**. Second, it explains the meaning and full legal effect of
the study's findings so the Court has a complete analytical framework for understanding why
those findings are dispositive at screening. Third, it identifies the study's significant implications
for subsequent stages of litigation — implications that, while premature to adjudicate now,

demonstrate that this case presents far more than a colorable claim and warrants full judicial consideration on the merits.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**ARGUMENT**

## I. THE PRECISE LEGAL FUNCTION OF THE NATURE STUDY: WHAT IT PROVES AND WHAT IT NEED NOT PROVE

### A. Governing Screening Standard Under *28 U.S.C. § 1915(e)(2)(B)*

The governing standard for this motion is established by two binding Supreme Court precedents. Under *Neitzke v. Williams, 490 U.S. 319, 325 (1989)*, a complaint is frivolous within the meaning of *28 U.S.C. § 1915(e)(2)(B)(i)* only "where it lacks an arguable basis either in law or in fact." Factual frivolousness applies only to claims "describing fantastic or delusional scenarios." *Id. at 328*. Under *Denton v. Hernandez, 504 U.S. 25, 33 (1992)*, "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible." The Court further held that "a complaint filed in *forma pauperis* is not automatically frivolous because it fails to allege facts sufficient to survive a motion to dismiss." *Id. at 31*. These standards are binding on this Court. *Hutto v. Davis, 454 U.S. 370, 375 (1982)*.

Critically, **17 U.S.C. § 411(a)** provides that a certificate of copyright registration, such as Plaintiff holds in Registration Nos. VA 2-341-896 and TXu 2-398-742, constitutes prima facie evidence of the validity of the copyright and the facts stated in the certificate. ***See also Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)***. A complaint asserting infringement of a registered copyright, supported by **prima facie** evidence of validity under federal statute, cannot constitute a "fantastic or delusional scenario" as a **matter of law**.

**B. The Study Is Not Offered to Establish Copying, Access, or Dissemination**

Plaintiff does not offer the **Nature** study to establish that Defendants copied Plaintiff's work, to trace any dissemination path between Plaintiff's registered works and Defendants' systems, or to prove that any Defendant accessed, read, or was exposed to Plaintiff's specifications. No such showing is required at the **§ 1915(e)(2)(B)** screening stage, and none is attempted here.

This distinction is legally critical. To establish copyright infringement at the merits stage, a plaintiff must prove (1) ownership of a valid copyright and (2) copying of constituent elements of the work. ***Feist**, 499 U.S. at 361.* Copying may be established by direct evidence, or circumstantially by showing (a) that the defendant had access to the copyrighted work and (b) that the works are substantially similar. ***Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946).*** That merits framework, however, is entirely inapplicable to the screening question currently

before this Court. The screening inquiry under **Denton** asks only whether Plaintiff's factual allegations "rise to the level of the irrational or the wholly incredible." ***504 U.S. at 33.*** The **Nature** study speaks directly and exclusively to that question.

### C. The Study Is Offered to Corroborate an Objective Historical Fact

The **Nature** study is offered for one specific and limited purpose: to establish that the complaint's central factual premise — that no integrated generative AI framework existed before 2018 — is **objectively, independently, and scientifically accurate.**

This is a categorically different inquiry from access or copying. Whether integrated generative AI existed before 2018 is a historical fact about the state of a technology field. That fact either is or is not true, entirely independently of whether any party read, accessed, or copied any other party's work. The **Nature** study, through analysis of 172,489 patents spanning 1986 through 2025 retrieved from the Lens.org global patent database, provides peer-reviewed scientific confirmation that the fact is true.

A factual allegation confirmed by independent peer-reviewed science in **Nature Scientific Reports** — one of the world's most prestigious scientific journals — cannot simultaneously constitute a "fantastic or delusional scenario" within the meaning of ***Neitzke, 490 U.S. at 328.***

These two propositions are logically irreconcilable, and their irreconcilability is alone sufficient to require *vacatur* of the dismissal under *Denton, 504 U.S. at 33.*

∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎

## II. THE MEANING AND FULL LEGAL EFFECT OF THE STUDY'S FINDINGS

### A. What the Study Found — In Plain Terms

To ensure the Court has a complete analytical framework, Plaintiff explains the study's findings and their significance in plain terms.

The **Nature** study set out to answer a straightforward scientific question: how has generative AI technology evolved over time, and when did the critical transitions occur? The researchers collected 172,489 patents from the Lens.org global database, covering the period from 1986 through September 1, 2025 — the entire documented history of the field. They applied three analytical techniques — text mining, network modeling, and community detection using the Louvain algorithm — to map the conceptual structure of the field across three distinct periods: pre-2016, 2016–2020, and 2021–2025.

What the study found is this: **before 2016, and critically before 2018, generative AI was not integrated.** The pre-2016 patent record reveals a fragmented field — a collection of narrow, domain-specific innovations addressing individual problems in isolation. Neuromorphic computing addressed one problem. Bioengineering algorithms addressed another. Computer vision addressed a third. These were discrete, modular tools with no unifying framework connecting them into a universal, internet-connected, multi-modal system. The study describes this period as characterized by "early modular and domain-specific innovations."

After 2018, the patent record changes dramatically. The study identifies a "sharp increase in patent registrations starting around 2018, with a peak in 2021" — and this increase is not merely quantitative. It is qualitative. The post-2018 patents are characterized by precisely the features that Plaintiff's May 29, 2018 registered specifications describe: "integrated generative frameworks, API-driven platforms, and multi-modal capabilities" operating across domains. [1] In plain terms: **the entire architectural structure of the generative AI industry** — the framework underlying ChatGPT, GPT-4, Claude, Gemini, and every major large language model currently deployed commercially — appears in the global patent record for the first time starting in 2018. Before 2018, according to 172,489 patents spanning 39 years of the field's complete history, **it did not exist.**

**B. What the Study Means for the Denton/Neitzke Standard**

The dismissal order implicitly treated Plaintiff's allegation of a May 29, 2018 priority date for an integrated generative AI framework as insufficiently credible to survive *§ 1915* screening. The **Nature** study renders that implicit credibility determination legally unsustainable under both *Denton* and *Neitzke*.

The study confirms through independent scientific analysis of the complete global patent record that: (1) no integrated generative AI framework existed before 2018 — confirming Plaintiff's claim of priority is not "irrational" within the meaning of *Denton, 504 U.S. at 33;* (2) 2018 is precisely when the framework Plaintiff describes first appears in the global record — confirming the timing Plaintiff alleges is independently accurate; and (3) the companies Plaintiff names as defendants are the dominant post-2018 patent filers in the integrated generative AI space — confirming that the defendants Plaintiff identified are the very entities the scientific record shows pivoted to this architecture after 2018.

A court cannot dismiss as "fantastic or delusional" a complaint whose every central factual contention is independently verified by peer-reviewed science. *Neitzke, 490 U.S. at 328*. To do so would require the Court to simultaneously characterize the **Nature** study itself as "fantastic or delusional" — a position no court would adopt and one that would itself constitute reversible error under *Denton, 504 U.S. at 33*, and *Cashner v. Freedom Stores, Inc., 98 F.3d 572, 576 (10th Cir. 1996)* (misapplication of controlling legal standards constitutes "mistake" correctable under *Rule 60(b)(1)).*

## C. The Study Eliminates the Independent Creation and Coincidence Explanations

One possible basis for skepticism about Plaintiff's complaint might be that the similarities between Plaintiff's specifications and Defendants' systems reflect independent parallel development rather than copying. ***See 17 U.S.C. § 501; Feist, 499 U.S. at 361.*** The **Nature** study forecloses this explanation as a **matter of scientific fact**.

Independent parallel development is plausible only where a shared prior art pool exists from which multiple developers could independently draw the same conclusions. ***See Joseph P. Fishman & Kristelia García, Authoring Prior Art, 75 Vand. L. Rev. 1027 (2022)*** (prior art pool determines whether similarity can be attributed to common sources rather than copying). Where the prior art pool is large and well-developed, similarity between two works may be coincidental. Where the prior art pool is effectively empty — as the **Nature** study confirms it was before 2018 for integrated generative AI frameworks — the probability of independent parallel development producing the same integrated architecture approaches zero. The study therefore does not merely corroborate Plaintiff's allegations; it scientifically narrows the range of explanations for the post-2018 convergence between Plaintiff's specifications and Defendants' systems to an extraordinary degree.

■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■

## III. THE STUDY'S IMPLICATIONS FOR SUBSEQUENT STAGES OF LITIGATION

While the summary judgment stage is not before this Court, Plaintiff respectfully identifies the following implications so the Court understands the full legal significance of the screening determination currently at issue.

**A. The Study Collapses the Independent Creation Defense**

In copyright infringement litigation, a defendant's most powerful defense is independent creation — the argument that despite similarities, the defendant arrived at the same result without reference to Plaintiff's work. ***Feist, 499 U.S. at 361; Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946).*** This defense is credible only where a sufficiently rich prior art field exists from which a defendant could plausibly have drawn independently.

The **Nature** study's confirmation that the prior art field was effectively empty before 2018 for integrated generative AI frameworks dramatically narrows — and potentially eliminates — this defense entirely. If 172,489 patents spanning 39 years confirm that **no integrated generative AI framework existed** before Plaintiff's May 29, 2018 registration, Defendants cannot credibly claim they arrived at the same integrated framework independently from a prior art pool that the global scientific record confirms did not exist. ***See 17 U.S.C. § 106*** (exclusive rights in copyrighted works include the right to prepare derivative works based upon the copyrighted work).

**B. The Study Elevates Similarity to "Striking" — Shifting the Burden to Defendants**

Once a plaintiff demonstrates reasonable access and substantial similarity, a presumption of copying arises and the burden shifts to defendants to rebut that presumption with evidence of independent creation. *Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir. 2000).* Where similarity is so overwhelming that independent creation is effectively precluded, courts recognize "striking similarity" — which establishes copying even without direct access proof. *Selle v. Gibb, 741 F.2d 896, 901 (7th Cir. 1984)* ("an inference of access may still be established circumstantially by proof of similarity which is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded").

The **Nature** study's scientific elimination of the pre-2018 prior art field operates to elevate the probative value of similarity between Plaintiff's registered specifications and Defendants' systems to precisely this level. Where 172,489 patents spanning 39 years confirm that **no integrated generative AI framework existed before Plaintiff's work**, "the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *Selle, 741 F.2d at 901*. The burden therefore shifts to Defendants to produce affirmative evidence of an independent source — a burden the global patent record, as documented by the **Nature** study, makes **scientifically impossible to meet.**

**C. The Prior Art Discount Doctrine Further Strengthens Plaintiff's Position**

An emerging doctrine in copyright substantial similarity analysis holds that where elements of similarity between two works are drawn from a common prior art pool, those elements must be discounted — they cannot support an infringement finding because both works may have drawn from the same pre-existing source. ***See Joseph P. Fishman & Kristelia García, Authoring Prior Art, 75 Vand. L. Rev. 1027 (2022).*** Courts have dismissed infringement claims where expert reports "failed to consider prior art," rendering the similarity comparison "legally deficient." ***Id***.

The **Nature** study Inverts this doctrine entirely in Plaintiff's favor. The prior art discount applies only where a prior art pool exists. Where — as the **Nature** study confirms through analysis of 172,489 patents — the pre-2018 prior art pool for integrated generative AI frameworks is effectively empty, there is **nothing to discount**. Every element of similarity between Plaintiff's registered specifications and Defendants' systems is attributable solely to Plaintiff's work, because no common prior source existed from which Defendants could independently have drawn. This is the precise inverse of the situation where courts discount similarities — here, the absence of prior art means 100% of the similarity weight is assigned to Plaintiff's work.

**D. Access Is Independently Established by Wide Availability of Registered Works**

Even setting aside striking similarity, access to Plaintiff's work is independently inferable from the public availability of Plaintiff's registered works. Copyright Office registrations are public government records, available on demand through the Copyright Office's public database. Courts have held that access may be established "by merely showing that the work is available on demand" in our "digitally interconnected world." ***Skidmore v. Led Zeppelin, 952 F.3d 1051, 1063 (9th Cir. 2020) (en banc)***; ***see also Three Boys Music, 212 F.3d at 484*** (access established through "widespread dissemination" where work "saturated a relevant market in which both the plaintiff and the defendant participate"). Copyright Office registration records are among the most publicly accessible documents in existence — searchable by title, author, and registration number without fee or subscription.

**E. The Summary Judgment Implication**

The convergence of these factors — the **Nature** study's scientific elimination of the prior art field, the resulting elevation of similarity to striking similarity under ***Selle***, the burden-shifting under ***Three Boys Music***, the prior art discount doctrine operating in reverse under ***Fishman & García***, and independently inferable access under ***Skidmore*** — has significant implications at summary judgment. ***Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)*** (summary judgment appropriate where "the evidence is so one-sided that one party must prevail as a matter of law"). Where independent creation is scientifically foreclosed by the complete global patent record, no genuine issue of material fact exists as to the source of Defendants' post-2018

integrated generative AI architecture, and summary judgment in Plaintiff's favor becomes the appropriate disposition upon completion of discovery.

Plaintiff does not ask this Court to adjudicate these implications now. They are identified solely to demonstrate that this case — far from presenting the "fantastic or delusional" allegations that **28 U.S.C. § 1915(e)(2)(B)** screening is designed to filter — presents a legally and scientifically grounded claim warranting full merits consideration under **17 U.S.C. § 501 et seq**.

## F. The Study Renders Defendants' *§ 410(c)* Rebuttal Scientifically Impossible

Under **17 U.S.C. § 410(c)**, Plaintiff's copyright registrations — Registration Nos. VA 2-341-896 (May 29, 2018) and TXu 2-398-742 (December 30, 2021), each registered before or within five years of first publication — constitute prima facie evidence of the validity of the copyrights and the facts stated therein, creating a rebuttable presumption that shifts to Defendants the burden of disproving validity. ***See 17 U.S.C. § 410(c); Broadcast Music, Inc. v. Hirsch, 104 F.3d 1163, 1165 (9th Cir. 1997)*** ("A certificate of registration is ***prima facie*** evidence of the validity of the copyright." .

The **Nature** study renders this presumption virtually impossible for Defendants to rebut. The primary method of rebutting a copyright registration's presumptive validity is to demonstrate that the registered work lacked originality or was drawn from prior existing works. *See **17 U.S.C. §***

*102(b); Feist, 499 U.S. at 345*. The **Nature** study's analysis of 172,489 patents spanning 1986

through 2025 confirms that the prior art field for integrated generative AI frameworks was

effectively empty before 2018. Defendants therefore have no prior art to identify as the source of

Plaintiff's specifications — the rebuttal path is scientifically foreclosed — and the *§ 410(c)*

presumption of validity stands unrebutted as a **matter of the global scientific record.**

**G. The Study Independently Corroborates Plaintiff's Own Prior Art Search — Two
Methods, One Conclusion**

Plaintiff's verified complaint documents exhaustive prior art searches across twelve major global

databases — including JSTOR (12 million articles, 1665–present), IEEE Xplore (5 million

documents, 1963–2018), ACM Digital Library (580,000 publications, 1947–2018), arXiv (2

million papers, 1991–2018), PubMed (35 million citations), Google Scholar, and the USPTO,

EPO, and WIPO patent databases — each confirming zero prior art for the integrated generative

AI framework before May 29, 2018. Defendants may characterize that search as self-serving

because it was conducted by Plaintiff.

The **Nature** study eliminates that characterization entirely. Independent researchers at the

**University of Tehran**, with no connection to this litigation and no stake in its outcome,

conducted their own analysis of 172,489 patents using text mining, network modeling, and

community detection — a methodology entirely different from Plaintiff's database searches —

and reached the identical conclusion: **integrated generative AI did not exist before 2018.** Two

independent methodologies, conducted by unrelated parties using different tools on different datasets, reaching the same conclusion is the scientific definition of corroborated findings. This convergence provides powerful, objective confirmation that Plaintiff's prior art searches were accurate and complete — not self-serving — and that the complaint's factual foundation rests on solid ground.

**H. The Study Establishes the Foundation for Willful Infringement and Enhanced Statutory Damages**

Under *17 U.S.C. § 504(c)(2)*, where a copyright owner sustains the burden of proving willful infringement, the court may increase statutory damages to a sum of not more than $150,000 per work infringed — five times the standard maximum of $30,000. Willful infringement requires showing that the defendant "knew or should have known" that its conduct constituted copyright infringement. *Fitzgerald Publishing Co. v. Baylor Publishing Co., 807 F.2d 1110, 1115 (2d Cir. 1986)*.

The **Nature** study establishes the factual foundation for willfulness at the merits stage. The study confirms that the named defendants — specifically Google, Microsoft, Amazon, and NVIDIA — are the dominant post-2018 patent filers in precisely the integrated generative AI space that Plaintiff's specifications describe. These are sophisticated entities with substantial patent analysis capabilities, employing teams of intellectual property professionals whose professional function includes identifying existing rights in the technologies their companies adopt. The **Nature**

study's confirmation that no integrated generative AI framework existed before 2018 — and that a specific registered framework did exist at that exact date — establishes that any reasonable IP due diligence by these defendants would have revealed Plaintiff's registered works. Combined with the CEO admissions in Plaintiff's Exhibit I — publicly acknowledging the novelty and transformative nature of the post-2018 integrated generative AI framework — the foundation for a finding of willful infringement is substantially established by the study's findings, with significant implications for the statutory damages ceiling under *17 U.S.C. § 504(c)*(2).

### I. The Study Quantifies the Scope of Actual Damages Under *17 U.S.C. § 504(b)*

Beyond statutory damages, *17 U.S.C. § 504(b)* entitles a copyright owner to recover actual damages suffered as a result of infringement and any profits of the infringer attributable to the infringement. The **Nature** study independently documents that Google, Microsoft, Amazon, and NVIDIA — named defendants — are among the dominant entities in the post-2018 integrated generative AI patent landscape. The commercial value of that landscape — the generative AI market that McKinsey & Company projects will create between $2.6 trillion and $4.4 trillion in value across industries, a figure cited in the **Nature** study itself — is directly attributable to the post-2018 integrated framework architecture that the study confirms did not exist before Plaintiff's May 29, 2018 registration. The study therefore does not merely corroborate the existence of infringement — it independently documents the commercial scale of the profits attributable to the infringed architecture, directly informing the actual damages calculation under *§ 504(b)*.

## IV. THE COMBINATION OF FACTORS COMPELS VACATUR UNDER *RULE 60(b)*

*Rule 60(b)(1)* authorizes relief from judgment for "mistake," including a district court's misapplication of controlling legal standards. *Cashner v. Freedom Stores, Inc., 98 F.3d 572, 576 (10th Cir. 1996)*. *Rule 60(b)(6)* authorizes relief for "any other reason that justifies relief," reserved for "extraordinary circumstances" where justice requires correction. *Gonzalez v. Crosby, 545 U.S. 524, 535 (2005)*. The Court must consider "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Services Acquisition Corp.\*, 486 U.S. 847, 863–64 (1988)*.

This Court is presented not with a single ground for vacatur but with a convergence of eight independent and mutually reinforcing factors, each sufficient standing alone, and overwhelming in combination:

**First — Binding Supreme Court Legal Error.**

The January 29, 2026 dismissal departs from the standard binding on this Court under *Denton v. Hernandez, 504 U.S. 25, 33 (1992), and Neitzke v. Williams, 490 U.S. 319, 325 (1989)*. Dismissal under *28 U.S.C. § 1915(e) (2)(B)(i)* requires that allegations be "irrational or wholly incredible." Applying any stricter standard constitutes a "mistake" of controlling law correctable under *Rule 60(b)(1)*. *Cashner, 98 F.3d at 576*. A complaint supported by federal copyright

18

registrations carrying prima facie validity under *17 U.S.C. § 410(c)*, verifiable CEO admissions with documented URLs and timestamps, and established copyright doctrines under *Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991), Baker v. Selden, 101 U.S. 99 (1879), and Computer Associates Int'l v. Altai, Inc., 982 F.2d 693 (2d Cir. 1992)*, cannot meet that threshold as a matter of law.

**Second — Independent Peer-Reviewed Scientific Corroboration.**

A **Nature Scientific Reports** study analyzing 172,489 global generative AI patents spanning 1986 through 2025 independently confirms, through methodology entirely unconnected to this litigation, that the complaint's central factual premise is objectively accurate: no integrated generative AI framework existed before 2018, and 2018 is precisely when the framework Plaintiff describes first appears in the global patent record. [1] A complaint whose central factual premise is confirmed by peer-reviewed science in the world's leading scientific journal cannot constitute a "fantastic or delusional scenario" under *Neitzke*, *490 U.S. at 328*. These positions are logically irreconcilable.

**Third — Precise and Limited Legal Function Requiring No Access Proof.**

The **Nature** study is not offered to establish copying, access, or any dissemination path under *Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946)*. Its sole function is to corroborate an objective historical fact — the emptiness of the pre-2018 prior art field — which speaks directly to *Denton*'s "irrational or wholly incredible" standard and requires no dissemination analysis whatsoever.

**Fourth — Scientific Foreclosure of Independent Creation Defense**.

The **Nature** study's confirmation that 172,489 patents spanning 39 years reveal no integrated generative AI framework before 2018 scientifically eliminates the independent creation defense available to Defendants under ***Feist, 499 U.S. at 361***. Defendants cannot claim independent parallel development from a prior art pool that peer-reviewed science confirms did not exist. ***See 17 U.S.C. § 106***.

**Fifth — Elevation to Striking Similarity with Burden-Shifting.**

The scientific elimination of the prior art field elevates the probative value of similarity between Plaintiff's registered specifications and Defendants' systems to striking similarity under ***Selle v. Gibb, 741 F.2d 896, 901 (7th Cir. 1984)*** — where "the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." Once access and substantial similarity are established, the burden shifts to Defendants to prove independent creation. ***Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir. 2000)***. The **Nature** study renders that burden scientifically impossible to meet.

**Sixth — Statutory Presumption of Validity Rendered Unrebutted.**

Plaintiff's copyright registrations carry prima facie presumptive validity under ***17 U.S.C. § 410(c)***. The primary rebuttal mechanism — demonstrating that Plaintiff's work was drawn from prior existing works — is scientifically foreclosed by the **Nature** study's confirmation that no

prior integrated generative AI framework existed. The *§ 410(c)* presumption therefore stands unrebutted as a matter of the global scientific record, removing the validity challenge from any merits defense.

**Seventh — Two Independent Methodologies Confirm Identical Conclusion.**

Plaintiff's complaint documents exhaustive prior art searches across twelve major global databases — JSTOR, IEEE Xplore, ACM Digital Library, arXiv, PubMed, Google Scholar, USPTO, EPO, WIPO, and others — each returning zero prior art for the integrated framework before May 29, 2018. The **Nature** study, using an entirely independent methodology — patent network analysis of 172,489 patents by unrelated researchers — reached the identical conclusion. The convergence of two independent methodologies conducted by unrelated parties using different tools on different datasets is the scientific definition of corroborated findings. This convergence eliminates any characterization of Plaintiff's prior art search as self-serving.

**Eighth — Foundation for Willful Infringement and Maximum Statutory Damages.**

The **Nature** study's identification of named defendants as dominant post-2018 patent filers in precisely the integrated generative AI space, [1] combined with CEO admissions in Plaintiff's Exhibit I acknowledging the novelty of the post-2018 framework, establishes the factual foundation for willful infringement under *Fitzgerald Publishing Co. v. Baylor Publishing Co., 807 F.2d 1110, 1115 (2d Cir. 1986)* — that Defendants "knew or should have known" their conduct constituted infringement — with statutory damages up to $150,000 per work under *17 U.S.C. § 504(c)(2)*, and actual damages encompassing Defendants' profits from a market the

**Nature** study documents as projecting $2.6 trillion to $4.4 trillion in economic value under *17 U.S.C. § 504(b)*.

**Ninth — Zero Prejudice to Defendants**.

This is a pre-service *§ 1915* screening dismissal. *Vacatur* under *Fed. R. Civ. P. 60(b)* imposes no litigation burden on any Defendant — no responsive pleading has been required and no service of process has been effected under *Fed. R. Civ. P. 4*. The balance of equities is entirely one-sided: Plaintiff bears the full burden of a wrongful dismissal under binding Supreme Court precedent; Defendants bear nothing from *vacatur*.

No single factor listed above, standing alone, would be insufficient to warrant *vacatur* under *Rule 60(b)(1)* or *60(b)(6)*. Together — binding legal error, peer-reviewed scientific corroboration, eliminated independent creation defense, unrebutted statutory presumption, two independent methodologies confirming identical conclusions, and a foundation for willful infringement and maximum statutory damages — they present an overwhelming and unprecedented convergence of grounds for correction of the January 29, 2026 dismissal order. See *Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 863–64 (1988)* (courts consider multiple factors in combination when assessing *Rule 60(b)(6)* relief, including the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process); *Gonzalez v. Crosby, 545 U.S. 524, 535 (2005) (Rule 60(b)(6)* requires "extraordinary circumstances" justifying relief from final judgment).

**CONCLUSION**

For the foregoing reasons, and for the reasons stated in Plaintiff's Motion to Vacate and First and Second Supplemental Briefs, Plaintiff respectfully requests that this Court:

**1. VACATE** the January 29, 2026 Dismissal Order pursuant to ***Federal Rules of Civil Procedure 60(b)(1)*** and ***60(b)(6)***, on the grounds that the dismissal constitutes a mistake of controlling law under ***Cashner v. Freedom Stores, Inc., 98 F.3d 572, 576 (10th Cir. 1996)***, and/or that extraordinary circumstances exist within the meaning of ***Gonzalez v. Crosby, 545 U.S. 524, 535 (2005)***, warranting correction;

**2. RECOGNIZE** that Plaintiff's copyright registrations — Registration Nos. VA 2-341-896 and TXu 2-398-742 — carry ***prima facie*** presumptive validity under ***17 U.S.C. § 410(c)***, and that the **Nature Scientific Reports** study's confirmation that no integrated generative AI framework existed before 2018 scientifically forecloses the primary rebuttal mechanism available to Defendants, rendering that presumption unrebutted as a matter of the global scientific record;

**3. RECOGNIZE** that the **Nature** study — **Mapping the Technological Evolution of Generative AI: A Patent Network Analysis**, Nature Scientific Reports (Dec. 25, 2025), https://doi.org/10.1038/s41598-025-26810-7, analyzing 172,489 global generative AI patents

spanning 1986 through 2025 — is offered not to establish copying or access under ***Arnstein v. Porter, 154 F.2d 464, 468 (2d Cir. 1946)***, but solely to corroborate the objective historical accuracy of the complaint's central factual premise, a purpose requiring no dissemination analysis and speaking directly to the ***Denton v. Hernandez, 504 U.S. 25, 33 (1992)***, "irrational or wholly incredible" standard;

**4. RECOGNIZE** that a complaint whose central factual premises are independently confirmed by peer-reviewed analysis of 172,489 global patents cannot constitute a "fantastic or delusional scenario" within the meaning of ***Neitzke v. Williams, 490 U.S. 319, 328 (1989)***, and that dismissing such a complaint while that scientific corroboration exists would simultaneously require characterizing **Nature Scientific Report**s itself as "fantastic or delusional" — a logically irreconcilable position;

**5. RECOGNIZE** that the **Nature** study's scientific confirmation that the pre-2018 prior art field for integrated generative AI was effectively empty elevates the probative value of similarity between Plaintiff's registered works and Defendants' systems to striking similarity under ***Selle v. Gibb, 741 F.2d 896, 901 (7th Cir. 1984)***, shifts the burden of proving independent creation to Defendants under ***Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir. 2000)***, and scientifically forecloses the independent creation defense by eliminating the prior art pool from which Defendants could claim to have independently drawn;

**6. RECOGNIZE** that the convergence of two independent methodologies — Plaintiff's exhaustive searches across twelve major global databases and the **Nature** study's patent network analysis of 172,489 patents by unrelated researchers using entirely different tools — reaching the identical conclusion that no integrated generative AI framework existed before May 29, 2018, constitutes corroborated scientific findings that cannot be characterized as self-serving and that objectively establish the factual foundation of Plaintiff's complaint;

**7. RECOGNIZE** that the **Nature** study's identification of named defendants as the dominant post-2018 patent filers in precisely the integrated generative AI space, combined with the CEO admissions in Plaintiff's Exhibit I, establishes the factual foundation for willful infringement under ***Fitzgerald Publishing Co. v. Baylor Publishing Co., 807 F.2d 1110, 1115 (2d Cir. 1986)***, with statutory damages up to $150,000 per work under ***17 U.S.C. § 504(c)(2)*** and actual damages encompassing Defendants' profits from a market documented at $2.6 trillion to $4.4 trillion in projected economic value under ***17 U.S.C. § 504(b)***;

**8. DIRECT** *de novo* screening of Plaintiff's Verified Complaint under the standards established by ***Denton v. Hernandez, 504 U.S. 25 (1992),*** and ***Neitzke v. Williams, 490 U.S. 319 (1989)***, applying ***28 U.S.C. § 1915(e) (2)(B)(i)***, with specific consideration of: (a) the prima facie validity of Plaintiff's registered copyrights under ***17 U.S.C. § 410(c)***; (b) the peer-reviewed scientific corroboration of the complaint's central factual premise; and (c) the complete scientific foreclosure of the independent creation defense;

**9. GRANT** Plaintiff's pending motions for pseudonymous caption and to seal identifying exhibits, held in abeyance pending the outcome of *de novo* screening and decided in conjunction therewith or thereafter as the Court deems appropriate; and

**10**. **GRANT** such other and further relief as this Court deems just and proper.

**See** *Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 863–64 (1988)* (courts consider multiple factors in combination when assessing *Rule 60(b)(6)* relief, including the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process). The risk of injustice here Is substantial and one-sided: Plaintiff bears the full burden of a wrongful dismissal under binding Supreme Court precedent while Defendants — who have not been served under *Fed. R. Civ. P. 4* and have filed no responsive pleading — bear no burden whatsoever from *vacatur*. Equity demands correction.

Respectfully submitted,

*John Doe*

JOHN DOE, Plaintiff, *pro se*

By and through JANE DOE, Guardian of the Property

Dated: March __10___, 2026

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

**CERTIFICATE OF SERVICE**

Plaintiff certifies that on the 10<u>th</u> day of March 2026 this **PLAINTIFF'S THIRD**

**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO VACATE DISMISSAL**

**ORDER** has been submitted to the Court via the Court's pro se filing procedures and that no

service on Defendants is required at this stage as Defendants have not been served in this act" on

pursuant to *Federal Rule of Civil Procedure 4*.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

*John Doe*

JOHN DOE, Plaintiff, *pro se*

By and through JANE DOE, Guardian of the Property