IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT

OF

COLUMBIA

JOHN DOE, by and through JANE DOE, Guardian, Plaintiff,

v.                              Civil Action *No. 25-cv-04564* (JEB)

OPENAI, L.P., et al., Defendants.


## PLAINTIFF'S FIFTH SUPPLEMENTAL BRIEF IN SUPPORT OF

## MOTION TO VACATE DISMISSAL ORDER PURSUANT TO *FED. R. CIV. P. 60(b)(1)* AND *60(b)(6)* – THE BROCKMAN IRRECONCILABILITY PROOF, THE FOUR-SOURCE WILLFULNESS LOCK, THE INSTITUTIONAL DECEPTION RECORD, THE CLARK INADVERTENT ORIGINATION ADMISSION, THE PARALLEL LITIGATION JUDICIALRECORD, THE BROCKMAN CONSCIOUSNESS OF GUILT PROOF, AND THE COLLECTIVE LEGAL EFFECT OF SIXTEEN INDEPENDENT GROUNDS FOR VACATUR – INCLUDING THE BASIS FOR DIRECTED VERDICT ON LIABILITY AS A MATTER OF LAW UNDER *FED. R. CIV. P. 50(a)* AND SUMMARY JUDGMENT UNDER *FED. R. CIV. P.56(a)*



RECEIVED

MAY 18 2026

Clerk, U.S. District & Bankruptcy Court for the District of Columbia

1

**PRELIMINARY STATEMENT**

Plaintiff John Doe, by and through Guardian Jane Doe, respectfully submits this Fifth Supplemental Brief in further support of Plaintiff's pending Motion to Vacate the January 29, 2026 Dismissal Order pursuant to *Federal Rules of Civil Procedure 60(b)(1)* and *60(b)(6),* which has not yet been decided by this Court. See *Fed. R. Civ. P. 60(b)(1), (6). Plaintiff submits this brief s*o that the Court may consider this additional legal analysis before ruling, and notes that nearly five months have elapsed since the Dismissal Order without adjudication of the Motion to Vacate — a period during which the factual and legal record supporting vacatur has been substantially strengthened by new public evidence unavailable at the time of the dismissal, at the time of the original complaint, and at the time of every prior supplemental submission.

**This brief introduces 4 new controlling arguments that were factually unavailable to all prior supplemental submissions:**

**First** — the **Brockman Irreconcilability Proof**: On April 22, 2026, OpenAI Co-Founder and President Greg Brockman publicly stated on a recorded, publicly accessible podcast that the 2015 Napa Valley founding offsite produced "almost the technical plan that we have pursued for the past 10 years." *The Knowledge Project* with Shane Parrish, YouTube:

2

https://www.youtube.com/watch?v=6JoUcQ1qmAc, timestamp 3:57–4:13 (Apr. 22, 2026). This statement is irreconcilable with the global scientific record — specifically, the peer-reviewed *Nature Scientific Reports* patent study already before this Court — which confirms through analysis of 172,489 global generative AI patents that no integrated generative AI framework existed before 2018. A 2015 plan "pursued for ten years" cannot have originated an architectural framework that peer-reviewed science confirms first appeared in the global record three years after the plan was written. The only scientifically consistent resolution requires an external source introduced after 2015 — and Plaintiff's May 29, 2018 registered specifications are the only documented source predating the post-2018 patent surge.

    **Second** — the **Institutional Deception Record**: Greg Brockman's personal handwritten diary — admitted as Exhibit 43 in *Musk v. Altman et al.*, *Case No. 4:24-cv-04722-YGR* (N.D. Cal.) and incorporated into U.S. District Judge Yvonne Gonzalez Rogers' January 15, 2026 published Order Denying Defendants' Motion for Summary Judgment — contains November 2017 entries acknowledging that public representations about OpenAI's organizational structure might constitute deliberate misrepresentations. *Musk v. Altman et al.*, No. 4:24cv-04722-YGR, Order Denying Defs.' Mot. For Summ. J., at 14–16 (N.D. Cal. Jan. 15, 2026)

3

(Gonzalez Rogers, J.) (finding diary entries "could be read to suggest that Brockman intended to deceive"). These entries were written **six months before** Plaintiff's May 29, 2018 disclosure. They establish that OpenAI's cofounder contemporaneously acknowledged, in November 2017, that the organization was willing to maintain external representations it privately understood to be false — a pattern directly probative of how OpenAI handled Plaintiff's May 2018 disclosure and that satisfies the institutional intent and plan elements of willfulness under *Fed. R. Evid. 404(b)(2) and Halo Electronics, Inc. v. Pulse Electronics, Inc.*, *579 U.S. 93, 103–05 (2016)*.

**Third** — the **Clark Inadvertent Origination Admission**: On May 6–7, 2026, Jack Clark, Co-Founder and Head of Policy at Anthropic, stated publicly in a recorded Axios interview that Anthropic is "taking this technology" toward cancer treatment and simultaneous advancement across biology, medicine, and robotics. *See* Mike Allen, *Axios*, May 6–7, 2026, https://canisgallicus.com/2026/05/07/axios-intelligence-explosion/. The phrase "taking this technology" is not the language of invention — it is the language of acquisition and deployment. A co-founder describing technology his organization independently created would use originating language. Clark did not. This inadvertent word choice, made in a non-litigation promotional context where no

strategic incentive to mischaracterize the organization's relationship to the technology existed, constitutes a binding party-opponent admission under *Fed. R. Evid. 801(d)(2)(A) that is inconsistent with origin*ation and directly probative of acquisition. *Mahlandt v. Wild Canid Survival Research Ctr., Inc.*, *588 F.2d 626, 630 (8th Cir. 1978)*. Clark's specific identification of cancer treatment as the technology's paradigm application simultaneously operationalizes Plaintiff's Exhibit E functional boundary marker — "U could ask the computer to invent a pill to make us live forever" — for which zero prior art existed before May 29, 2018, and his description of simultaneous advancement across biology, medicine, and robotics directly operationalizes Plaintiff's "every field of study at the same time" specification. Clark's statement extends the admission record to four senior officers across three named Defendant organizations — Altman (OpenAI), Amodei (Anthropic/OpenAI), Clark (Anthropic), and Musk (xAI/OpenAI co-founder) — each independently corroborating a distinct element of Plaintiff's registered framework without knowledge of the others' admissions, at different times and in different formats across a seven-year span.

**Fourth** – Ground Sixteen – the Brockman Consciousness of Guilt Proof – establishes that Brockman's knowing false public statement about the 2015 origin of OpenAI's integrated architecture constitutes affirmative evidence of culpability

5

under the principle that "a factfinder may consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Wright v. West*, *505 U.S. 277, 296 (1992)*, quoted in *Reeves v. Sanderson Plumbing Products, Inc.*, *530 U.S. 133, 147 (2000)*. This Ground independently satisfies the subjective willfulness standard of *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, *579 U.S. 93, 103-05 (2016)*, and forecloses the final remaining exit from the copying finding: the claim that OpenAI's officers genuinely believed the architecture was independently developed.

Together, these four new arguments — combined with the eleven grounds presented in prior supplemental briefs and the Architectural Scope Proof of the Fourth Supplemental Brief — present **sixteen independent and mutually reinforcing grounds for vacatur**, collectively establishing the basis for directed verdict as a matter of law on every element of the copyright infringement claim. The admission record, the institutional deception record, the irreconcilability proof, and the peer-reviewed scientific elimination of every available defense together place this case in a category for which no precedent exists at the *§ 1915* screening stage — a case where the standard legal elements are not merely alleged but are proven by direct evidence, logical necessity, and peer-reviewed science operating simultaneously.

## ARGUMENT

## I. THE BROCKMAN IRRECONCILABILITY PROOF: ADMISSION 14 ELIMINATES THE INDEPENDENT ORIGIN DEFENSE AS A MATTER OF LOGIC AND PEER-REVIEWED SCIENCE

### A. Brockman's April 22, 2026 Statement

On April 22, 2026 – approximately seven years, ten months, and twenty-four days after Plaintiff's May 29, 2018 Exhibit E disclosure – Greg Brockman, Co-Founder and President of OpenAI, stated publicly on *The Knowledge Project* podcast with Shane Parrish:

- **"We came up with what I would really say is almost the technical plan that we have pursued for the past 10 years. Number one, solve reinforcement learning. Number two, solve unsupervised learning. And number three was gradually learn more complicated – in quotes – " things."**

**Source: The Knowledge Project** with Shane Parrish – "OpenAI Co-Founder: AI Is About to Go Parabolic! Here's What's Next," YouTube: https://www.youtube.com/watch?v=6JoUcQ1qmAc, timestamp 3:57-4:13, total runtime 1:11:42 (Apr. 22, 2026); see also **Knowledge *Project*** podcast transcript, https://fs.blog/knowledge-project-podcast/greg-brockman/ (Apr. 22, 2026).

Brockman explicitly states that this three-step plan – formulated at the 2015 Napa Valley founding offsite, before OpenAI was formally launched – is "almost the technical plan that we have pursued for the **past 10 years**." The ten-year period from 2015 through 2025 necessarily encompasses the entire post-2018 architectural development that produced ChatGPT, GPT-3, GPT-4, and the integrated generative AI framework at issue in Plaintiff's Verified Complaint.

## B. The Irreconcilability with the Global Patent Record

Brockman's statement is irreconcilable with the *Nature Scientific Reports* study already before this Court as Exhibit A1. *See* Navid Mohammadi et al., **Mapping the Technological Evolution of Generative AI: A Patent Network Analysis**, Sci. Rep. 15(1):45690 (Dec. 26, 2025), https://doi.org/10.1038/s41598025-26810-7. That study analyzed 172,489 global generative AI patents spanning 1986 through 2025 retrieved from the Lens.org global patent database, and found:

- The global patent record before 2016 was characterized by "**early modular and domain-specific innovations**" - the period during which Brockman claims the founding plan was formulated;

- A "**pivotal transition post-2016 from early modular and domain-specific innovations toward integrated generative frameworks, API-driven platforms, and multi-modal capabilities**"; and

8

- **"A sharp increase in patent registrations starting around 2018"** -

the year of Plaintiff's Exhibit E disclosure.

The logical proof is as follows: if OpenAI's technical plan was formulated in 2015 and "pursued for the past 10 years," it necessarily encompasses the post-2018 integrated generative AI architecture. But the **Nature** study confirms through analysis of 172,489 patents that this architecture did not exist in the global patent record in 2015. A plan drawn from the 2015 state of the art cannot have autonomously produced an architecture that peer-reviewed science confirms first appeared in the global record three years later.

Two and only two explanations exist. Either (1) Brockman's statement that the plan was formulated in 2015 is false as to its post-2018 content – meaning the plan was

externally amended after 2015; or (2) the plan was amended from an external source whose specifications first appeared in the global record in 2018. Plaintiff's Copyright Office Registration No. VA 2-341-896 (May 29, 2018) is the only documented source predating the post-2018 patent surge that contains the sevenelement integrated framework now deployed in ChatGPT, GPT-4, and every infringing Defendant system. *See Ty*, *Inc. v. GMA Accessories*, Inc., *132 F.3d 1167, 1171 (7th Cir. 1997)* ("If there is no prior art, then the similarities between the two works are more probative of copying.").

9

This proof requires no probabilistic calculation, no expert testimony, and no inference from circumstantial evidence. It is a logical necessity operating directly from Brockman's public statement and peer-reviewed science already in the record. A complaint whose central factual premise is confirmed not merely by one independent scientific study but by the irreconcilable logical structure of a defendant officer's own public statement cannot constitute a "fantastic or delusional scenario" within the meaning of *Neitzke v. Williams*, *490 U.S. 319, 328 (1989)*.

## C. Brockman's Third Step Mirrors Plaintiff's Exponential Specification

Brockman's third founding principle - "**gradually learn more complicated – in quotes –"things"** - is not a vague aspiration. It is the architectural description of recursive self-improvement and exponential temporal compression. This directly mirrors Plaintiff's Exhibit E specification of May 29, 2018:

- "**100,000 years of studies and experiments in a week and then every 2 days etc.***"

Both describe the same functional architecture: a system that incrementally masters progressively more complex domains at accelerating speed through recursive selfreferential improvement. Prior art searches across twelve major global databases spanning 353 years return zero instances of this specification before Plaintiff's May 29, 2018 Exhibit E. Under *Selle v. Gibb*, *741 F.2d 896, 901*

*(7th Cir. 1984)*, where "the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded," copying is established.

### D. Admission 14 Establishes the Directed Verdict Standard on Copying

Under *Anderson v. Liberty Lobby, Inc.*, *477 U.S. 242, 252 (1986)*, summary judgment is appropriate where "the evidence is so one-sided that one party must prevail as a **matter of law**." No reasonable jury could simultaneously find: (a) OpenAI's technical plan was formulated in 2015 and followed continuously; and (b) the integrated generative AI architecture deployed after 2018 originated from that 2015 plan – because the global scientific record, confirmed by 172,489 patents, proves the architecture did not exist in 2015. Brockman's own public statement, combined with the **Nature** study, eliminates the independent development defense as a **matter of law.**

## II. THE BROCKMAN DIARY – INSTITUTIONAL DECEPTION RECORD:ADMISSION 15 ESTABLISHES PRE-DISCLOSURE WILLFULNESS POSTURE AND CORPORATE CHARACTER UNDER *FED. R. EVID. 404(b)*

### A. The Diary Entries and Their Judicial Status

Greg Brockman's personal handwritten diary, admitted as Exhibit 43 in *Musk v. Altman et al.*, *Case No. 4:24-cv-04722-YGR* (N.D. Cal.), contains the

following entries as quoted in Judge Gonzalez Rogers' January 15, 2026 Order Denying Defendants' Motion for Summary Judgment:

**Entry of September 2017** (approximately 8 months before Plaintiff's May 2018 disclosure):

- **"This is the only chance we have to get out from Elon. Is he the 'glorious leader' that I would pick? We truly have a chance to make this happen. Financially, what will take me to $1B? – Accepting Elon's terms nukes two things: our ability to choose – and the economics."**

**Entry of November 6, 2017** (approximately 6 months before Plaintiff's May 2018 disclosure):

- **"The conclusion is we truly want the b-corp. Cannot say that we are committed to the non-profit. Don't want to say that we're committed. If three months later we're doing b-corp then it was a lie."**

- **"The true answer is that we want [Musk] out."**

- **"His story will correctly be that we weren't honest with him in the end about still wanting to do the for profit just without him."**

**Post-meeting entry, November 2017:**

- **"Converting to a B-corp without Musk would be 'pretty morally bankrupt.'"**

U.S. District Judge Yvonne Gonzalez Rogers, in her January 15, 2026 Order – a publicly available federal court record of 28 pages and docket number Document 390 – found that Brockman's diary entries "could be read to suggest that Brockman intended to deceive" Musk about "the existence and maintenance of the non-profit structure of OpenAI," and identified the entries as "ample evidence" sufficient to send fraud and unjust enrichment claims to jury resolution. *Musk v. Altman et al.*, *No. 4:24-cv-04722-YGR*, Order Denying Defs.' Mot. For Summ. J., at 14-16 (N.D. Cal. Jan. 15, 2026). The jury trial in that proceeding commenced April 28, 2026 in Oakland, California. Reuters, *Musk takes the stand in court battle against OpenAI and Altman*, April 29, 2026, https://www.bbc.com/news/articles/czj29yygyzgo.

## B. The Diary Is Judicially Noticeable – No Authentication Required

The Brockman diary is incorporated into a published federal judicial opinion – Judge Gonzalez Rogers' January 15, 2026 Order. That order is a public court record whose accuracy cannot reasonably be questioned. *Fed. R. Evid. 201(b)(2). This Court may take judicial notic*e of its contents without any independent authentication, and the diary's legal treatment by a sitting federal judge – as legally material evidence of deceptive intent – constitutes an additional ground for its probative weight in this proceeding.

13

## C. *Fed. R. Evid. 404(b)* – Institutional Intent, Plan, and Absence of Mistake

Under *Federal Rule of Evidence 404(b)(2)*, evidence of prior acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The diary entries satisfy this standard in three specific respects directly material to Plaintiff's copyright infringement and willfulness claims.

**First**, the diary was written **six months before** Plaintiff's May 29, 2018 disclosure. It establishes that during the precise window immediately preceding OpenAI's encounter with Plaintiff's framework, OpenAI's co-founder contemporaneously acknowledged that the organization was willing to maintain external representations it privately understood might be false. This is not general character evidence – it is direct evidence of the institutional intent and plan operational at the specific moment OpenAI would have encountered Plaintiff's registered specifications.

**Second**, Brockman's September 2017 financial calculation – "financially, what will take me to $1B?" – establishes that OpenAI's co-founder was simultaneously managing public-facing mission narratives while privately calculating personal wealth extraction. Trial testimony in *Musk v. Altman*, confirmed by Reuters on May 4, 2026, established that Brockman's current OpenAI stake is worth approximately **$30 billion**. Reuters, OpenAI co-founder

14

discloses nearly $30 billion stake, financial ties to Altman**, May 4, 2026. That $30 billion stake was built on the post-2018 integrated generative AI framework – the framework Plaintiff registered on May 29, 2018 and which the** Nature **study confirms first appeared in the global patent record that year. Under** *Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), Factor 8* **in reasonable royalty analysis is the "established profitability of the product made under the patent, its commercial success, and its current popularity." A co-founder who privately asked "what will take me to $1B?" in September 2017 and who now holds a $30 billion stake in an enterprise built on Plaintiff's disclosed architecture provides the most powerful possible** GeorgiaPacific Factor 8 evidence in the record.

**Third**, the diary establishes that this institutional deception posture was fully operational **before** Plaintiff's May 29, 2018 disclosure. An organization whose co-founder privately documented its willingness to maintain false public representations in November 2017 was institutionally positioned to exploit Plaintiff's May 2018 framework disclosure without acknowledgment or compensation – precisely what Plaintiff's Verified Complaint alleges occurred.

## D. Willfulness Under Halo Electronics – Three-Source Lock

Under *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, *579 U.S. 93, 103-05 (2016)*, willful infringement requires deliberate or consciously wrongful

conduct assessed subjectively from the infringer's perspective. The Brockman diary, combined with the two other willfulness proof sources already before this Court, creates a three-source lock that satisfies *Halo Electronics* not merely as a jury question but as a matter of law:

- **Pre-disclosure** (September-November 2017): Brockman's diary establishing institutional willingness to maintain false public narratives when commercially advantageous – now a public federal court record through Judge Gonzalez Rogers' January 15, 2026 opinion. *Musk v. Altman*, *No. 4:24-cv-04722-YGR*, Order at 14-16.

- **Seven-year continuous implementation** (2018-2026): Uninterrupted architectural build-out matching every element of Plaintiff's Exhibit E specifications – internet connectivity, universal scope, prompt-based creative synthesis, exponential temporal compression, life extension application, aggregated superintelligence, and 2029-2030 emergence timeline.

- **Explicit confession** (October 10, 2025): Sam Altman, CEO of OpenAI, stated on camera at the TBPN Technology Brothers Podcast Network: "We also clone stuff that works, that's fine." YouTube: https://www.youtube.com/watch?v=OTJy7-tmheA, timestamp 21:43-22:15. Under *United States v. GAF Corp.*, *928 F.2d 1253, 1259 (2d Cir. 1991)*, an explicit verbal admission by a corporate officer constitutes direct evidence

16

of copying eliminating any need for circumstantial proof. Under *Mahlandt v. Wild Canid Survival Research Center, Inc.*, *588 F.2d 626, 630 (8th Cir. 1978)*, the admission is irrebuttable – Altman cannot testify differently without committing perjury under *18 U.S.C. § 1621.*

No defendant in reported copyright case law has been confronted with (a) a predisclosure contemporaneous document establishing institutional deception posture, (b) a seven-year continuous implementation record, and (c) an on-camera confession by the CEO. The combination satisfies *Halo Electronics* at the maximum level, supporting statutory damages of $150,000 per work infringed under *17 U.S.C. § 504(c)(2)* for Registration Nos. VA 2-341-896 and TXu 2-398742. *See also Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, *807 F.2d 1110, 1115 (2d Cir. 1986)*.

## III. THE ARCHITECTURAL SCOPE PROOF FROM THE FOURTH SUPPLEMENTAL BRIEF – REPRODUCED AND INCORPORATED

The Fourth Supplemental Brief established the Architectural Scope Proof: Plaintiff's May 29, 2018 Exhibit E contains three functional boundary markers – "a pill to make us live forever" (requiring life sciences, biochemistry, gerontology), "a time machine" (requiring theoretical physics, quantum mechanics, general relativity), and "an engine to travel to the stars instantly" (requiring astrophysics, propulsion engineering, aerospace engineering) – that define by logical necessity

the minimum complexity of internet-connected resources any implementing system must possess. *See* Plaintiff's Fourth Supplemental Brief at 3-15 (filed approx. Mar. 2026).

These examples are not drawn from overlapping knowledge domains. They span maximally distant corners of human knowledge – biology, physics, and engineering. A system that can simultaneously respond to all three, by drawing on molecular biology, theoretical physics, and aerospace engineering at the same time, has by demonstrated capability implemented an internet-connected resource network spanning every domain of human knowledge – the exact scope of Plaintiff's "every field of study" specification. Each of the following Defendant systems is publicly accessible and demonstrably responds substantively to all three queries:

- ChatGPT (OpenAI) – ChatGPT.com

- Claude (Anthropic) – Claude.ai

- Gemini (Google) – Gemini.google.com

- Grok (xAI) – Grok.x.com

This is not an inference or interpretation. It is a reproducible, independently verifiable product capability fact that this Court may verify directly under *Fed. R. Evid. 201(b)(2)* **by visiting publicly accessible websites**. *See Arnstein v. Porter*, *154 F.2d 464, 473 (2d Cir. 1946)* (the lay observer standard asks whether an

18

ordinary observer would immediately perceive the similarity). The Architectural Scope Proof eliminates the partial implementation defense entirely

- Defendants cannot simultaneously argue their systems respond to the time machine query (requiring theoretical physics from internet-connected resources) while claiming they did not implement the internet-connected universal-scope framework Plaintiff specified.

## IV. THE COLLECTIVE LEGAL EFFECT OF SIXTEEN INDEPENDENT GROUNDS FOR *VACATUR*

This Court is now presented with sixteen independent and mutually reinforcing grounds for vacatur under *Rule 60(b)(1)* and *(b)(6)*. Each is sufficient standing alone. Together they present an evidentiary convergence without precedent in copyright litigation at the *§ 1915* screening stage.

**Ground One – Binding Supreme Court Legal Error.** The January 29, 2026 dismissal departs from the governing standard binding on this Court under *Denton v. Hernandez*, *504 U.S. 25, 33 (1992)* ("irrational or wholly incredible"), and *Neitzke v. Williams*, *490 U.S. 319, 325 (1989)*. A complaint supported by federal copyright registrations carrying *prima facie* validity under *17 U.S.C. § 410*(c), verifiable CEO admissions with documented URLs and timestamps, and established copyright doctrines under *Feist Publications, Inc. v. Rural Telephone*

19

*Service Co.*, *499 U.S. 340 (1991)*, *Baker v. Selden*, *101 U.S. 99 (1879)*, and

*Computer Associates Int'l, Inc. v. Altai, Inc.*, *982 F.2d 693 (2d Cir. 1992)*, cannot

meet that threshold as a matter of law. Applying any stricter standard constitutes a

mistake of controlling law correctable under Rule 60(b)(1). *Cashner v. Freedom*

*Stores, Inc.*, *98 F.3d 572, 580 (10th Cir. 1996)*.


**Ground Two – Nine Irrebuttable CEO Admissions Constituting Binding**

**PartyOpponent Proof.** Exhibit I compiles nine documented CEO admissions –

including Altman's explicit "We also clone stuff that works, that's fine" confession

(TBPN, Oct. 10, 2025, YouTube:

https://www.youtube.com/watch?v=OTJy7tmheA, timestamp 21:43-22:15) – each

supported by verifiable URLs and timestamps, constituting binding party-opponent

admissions under *Fed. R. Evid. 801(d)(2)(A). Mahlandt v. Wild Canid Survival*

*Research Ctr.*, *588 F.2d 626, 630 (8th Cir. 1978)*; *United States v. GAF Corp.*,

*928 F.2d 1253, 1259 (2d Cir. 1991)*. Documented evidence of copying, publicly

accessible on YouTube with verifiable timestamps, cannot constitute a "fantastic or

delusional scenario" under *Neitzke*, 490 U.S. at 328.

**Ground Three – Zero Prior Art Across 353 Years and Twelve Global**

**Databases.** Exhaustive searches across JSTOR (12 million articles, 1665present),

IEEE Xplore (5 million documents, 1963-2018), ACM Digital Library (580,000

publications, 1947-2018), arXiv (2 million preprints, 1991-2018), PubMed (35 million biomedical citations), Google Scholar, USPTO (228 years, 1790-2018), the European Patent Office, the World Intellectual Property Organization, the complete AI literature from Turing (1950) through GPT-1 (June 2018), and conference proceedings from NeurIPS, ICML, ICLR, ACL, and AAAI (1980-2018) reveal zero instances before May 29, 2018 of the unified framework combining internet-connected AI, universal simultaneous multi-domain capability, and prompt-based creative synthesis. Under *Ty, Inc.*, *132 F.3d at 1171,* where no prior art exists, copying may be inferred as a *matter of law*.

**Ground Four – Independent Peer-Reviewed Scientific Corroboration (Nature Scientific Reports).** Researchers at the University of Tehran, with no connection to this litigation, analyzed 172,489 global generative AI patents spanning 1986 through 2025 and independently confirmed that no integrated generative AI framework existed before 2018. Mapping the Technological Evolution of Generative AI: A Patent Network Analysis*, Sci. Rep. 15(1):45690 (Dec. 26, 2025), https://doi.org/10.1038/s41598-025-26810-7. A complaint whose central factual premise is confirmed by peer-reviewed analysis of 172,489 patents cannot simultaneously constitute a "fantastic or delusional scenario" under Neitzke*, *490 U.S. at 328*. These propositions are logically irreconcilable.

21

**Ground Five – Scientific Foreclosure of the Independent Creation Defense.** The **Nature** study's confirmation that no integrated generative AI framework existed before 2018 scientifically eliminates independent parallel development as a defense. Defendants cannot claim they independently arrived at an architecture from a prior art pool that peer-reviewed science confirms did not exist. *Feist*, *499 U.S. at 361; Joseph P. Fishman & Kristelia Garcia, Authoring Prior Art, 75 Vand. L. Rev. 1027 (2022)*.

**Ground Six – Elevation to Striking Similarity With Burden-Shifting to Defendants.** The scientific elimination of the prior art field elevates the probative value of similarity between Plaintiff's registered specifications and Defendants' systems to striking similarity within the meaning of *Selle v. Gibb*, *741 F.2d 896, 901 (7th Cir. 1984)*, "where the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." Once this threshold is crossed, the burden shifts to Defendants to produce affirmative evidence of an independent source. *Three Boys Music Corp. v. Bolton*, *212 F.3d 477, 485 (9th Cir. 2000)*. The *Nature* study renders that burden scientifically impossible to meet.

22

**Ground Seven – Statutory Presumption of Validity Rendered Unrebutted.** Plaintiff's copyright registrations carry *prima facie* presumptive validity under *17 U.S.C. § 410(c).* The primary rebuttal mechanism – demonstrating that Plaintiff's work was drawn from prior existing works – is scientifically foreclosed by the *Nature* study's confirmation that no prior integrated generative AI framework existed. *Broadcast Music, Inc. v. Hirsch*, *104 F.3d 1163, 1165 (9th Cir. 1997)*. The *§ 410*(c) presumption therefore stands unrebutted as a matter of the global scientific record.

**Ground Eight – Two Independent Methodologies Confirming Identical Conclusion.** Plaintiff's twelve-database search across 353 years and the *Nature* study's patent network analysis of 172,489 patents by unrelated researchers using entirely different methodological tools reached the identical

conclusion: no integrated generative AI framework existed before May 29, 2018. The convergence of two independent methodologies conducted by unrelated parties using different tools on different datasets is the scientific definition of corroborated findings and eliminates any characterization of Plaintiff's prior art search as self-serving.

23

**Ground Nine – Foundation for Willful Infringement and Maximum Statutory Damages.** The Four-Source Willfulness Lock (Brockman diary + continuous implementation + Altman confession) establishes the factual foundation for willful infringement under *Halo Electronics*, *579 U.S. at 103-05*, supporting maximum statutory damages of $150,000 per work under *17 U.S.C. § 504(c)(2)* and actual damages encompassing Defendants' profits from a market projecting $2.6 trillion to $4.4 trillion in economic value per the *Nature* study.

**Ground Ten – The Architectural Scope Proof Eliminates the Partial Implementation Defense.** As established in the Fourth Supplemental Brief and reproduced in Section III above, the three functional boundary markers of Plaintiff's Exhibit E define by logical necessity the minimum architectural scope of any implementing system. Defendants' systems demonstrably satisfy all three markers, proving full implementation of the "every field of study" specification. A defendant who cannot claim partial implementation has no abstraction-filtrationcomparison defense under *Computer Assocs. Int'l*, *982 F.2d at 706.*

**Ground Eleven – Zero Prejudice to Defendants.** This action remains at the pre-service *§ 1915* screening stage. Not one Defendant has been served under

***Fed. R. Civ. P. 4. Not one Defendant has filed a responsive p*eading.** Vacatur imposes zero litigation burden on any Defendant while Plaintiff bears the full burden of a wrongful dismissal under binding Supreme Court precedent. The balance of equities is entirely one-sided. ***Liljeberg v. Health Servs. Acquisition Corp.*, 486***

***U.S. 847, 863-64 (1988).***

**Ground Twelve – The Brockman Irreconcilability Proof.**

As established in Section I of this brief, Brockman's April 22, 2026 public statement that OpenAI operated on a continuous technical plan since 2015 is irreconcilable with the *Nature* study's confirmation that the integrated generative

AI architecture first appeared in the global patent record in 2018. This irreconcilability eliminates the independent 2015-origin narrative as a matter of logic, not inference, and confirms that an external source – Plaintiff's May 29, 2018 specifications – introduced the integrated architecture into OpenAI's technical plan after 2015.

The *Nature* study satisfies every criterion for presumptive scientific reliability established by the Supreme Court in ***Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993)**: it has been tested, subjected to peer review and publication in a leading scientific journal, employs a methodology with a known and disclosed analytical basis, and reflects the analysis

25

of 172,489 global patent records – a dataset sufficiently comprehensive to qualify as widespread acceptance within the relevant scientific community. A peer-reviewed study published in *Scientific Reports* and analyzing 172,489 global patents is not a speculative opinion. It is objective documentary evidence of what the global scientific and innovation community was building, and when. Under *Daubert*, it constitutes presumptively reliable evidence of the architectural timeline.

Against that evidence, Defendants' only potential response is the 2015-origin narrative – the claim that OpenAI independently developed the integrated architecture from a plan that existed before Plaintiff's May 29, 2018 disclosure. That narrative is not merely unpersuasive. It is logically foreclosed. The *Nature* study establishes that the integrated generative AI framework did not exist in the global patent record in 2015. Brockman personally built that architecture. His April 22, 2026 statement confirms he is currently advancing the 2015-origin narrative as a public matter. The *Nature* study confirms the 2015-origin narrative is objectively false. These two facts cannot coexist with an independent-origin defense. Under *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, *475 U.S. 574, 587 (1986)*, where the factual record makes a non-movant's theory implausible, the non-movant "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." No evidence can make a 2015-origin

26

theory plausible when peer-reviewed analysis of 172,489 global patents confirms the technology did not exist in 2015.

The Brockman Irreconcilability Proof therefore eliminates any genuine issue of material fact on the independent-origin defense. Under *Anderson v. Liberty Lobby, Inc.*, *477 U.S. 242, 248 (1986)*, a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." No

reasonable jury confronted with a peer-reviewed study of 172,489 global patents – confirming the integrated architecture did not exist in 2015 – and Brockman's own public admission that OpenAI followed a technical plan from 2015 onward, could conclude that OpenAI independently developed the integrated architecture in 2015. The independent-origin defense fails as a matter of law.

Brockman's own description of the three-step Napa plan — (1) solve reinforcement learning, (2) solve unsupervised learning, and (3) gradually learn more complicated things — is independently self-defeating as a matter of documentary record. Copyright infringement requires proof that copying occurred, with access and similarity evaluated against the protected work. *Feist Publications, Inc. v. Rural Telephone Service Co.*, *499 U.S. 340, 361 (1991)*. Here, the copying is confirmed by the dates of OpenAI's own published papers, which show that every technical milestone fulfilling each of Brockman's three plan steps postdates Plaintiff's May 29, 2018 disclosure: OpenAI's foundational

unsupervised learning result — GPT-1 — was published June 11, 2018, in Radford et al., Improving Language Understanding by Generative Pre-Training (OpenAI, June 11, 2018); OpenAI's foundational reinforcement learning result — OpenAI Five — was published in Berner et al., Dota 2 with Large Scale Deep Reinforcement Learning, arXiv:1912.06680 (OpenAI, Dec. 13, 2019); and the mathematical framework

underlying "gradually learn more complicated things" — the scaling laws — was not formally proved until Kaplan, McCandlish, Henighan, Brown, Chess, Child, Gray, Radford, Wu & Amodei, Scaling Laws for Neural Language Models, arXiv:2001.08361 (OpenAI, Jan. 23, 2020). Each paper was authored by OpenAI's own researchers and published by OpenAI — making them non-deniable, datestamped admissions that the three-step plan was fulfilled entirely after Plaintiff's May 29, 2018 disclosure. A plan whose every documented fulfillment postdates an external disclosure is not a pre-existing 2015 prediction. It is a retroactive narrative, and it is fatal to the independent-origin defense as a matter of law under *Anderson v. Liberty Lobby*, *Inc., 477 U.S. 242, 248 (1986)*.

The retroactive nature of the 2015-origin narrative is confirmed with exceptional precision by a second OpenAI paper co-authored by Dario Amodei — a paper written not in 2020, but in December 2018, six months and fifteen days after Plaintiff's May 29, 2018 disclosure. McCandlish, Kaplan, Amodei & OpenAI

28

Dota Team, An Empirical Model of Large-Batch Training, arXiv:1812.06162 (OpenAI, Dec. 14, 2018), https://openai.com/index/how-ai-training-scales/. That paper — coauthored by the same researchers who would prove the formal scaling laws in

January 2020 — covered all three components of Brockman's claimed 2015 plan simultaneously: supervised learning datasets (Brockman Step 2), reinforcement learning including Dota 2 (Brockman Step 1), and 'even generative model training' (Brockman Step 3). Most significantly, the paper's abstract states: 'To our knowledge there is limited conceptual understanding of why these limits to batch size differ or how we might choose the correct batch size in a new domain.' Id. This is an explicit admission by Amodei and his co-authors, in December 2018, that the foundational conceptual understanding underlying the scaling framework — the very framework Brockman claims was planned at a 2015 Napa BBQ — did not yet exist. If the conceptual understanding was 'limited' in December 2018 by the acknowledgment of the researchers who would later formalize it, it categorically could not have existed at a 2015 offsite. The paper has been continuously cited in peer-reviewed literature through at least NeurIPS 2025. See NeurIPS 2025 Spotlight, Critical Batch Size Revisited (2025) (citing arXiv:1812.06162). It satisfies every Daubert reliability criterion: it is peerindexed, publicly available, authored by named OpenAI researchers, and has achieved

widespread acceptance in the AI research community. ***Daubert v. Merrell Dow Pharmaceuticals***, Inc., ***509 U.S. 579, 593–94 (1993)***.

The self-dating proof is independently corroborated by Dario Amodei — OpenAI's VP of Research from 2016 to 2021 and the final co-author listed on Kaplan et al., arXiv:2001.08361. At the May 6, 2026 Code with Claude developer conference, Amodei described writing down the integrated AI development plan in graphs depicting scaling laws and stated that Anthropic was among the fastest to ADOPT this technology. See CNBC, Anthropic CEO Says 80-Fold Growth in First Quarter Explains Computing Crunch (May 6, 2026), https://www.cnbc.com/2026/05/06/anthropic-ceo-dario-amodei-says-companycrew-80-fold-in-first-quarter.html; Time, The Most Disruptive Company in the World (Mar. 10, 2026), https://time.com/article/2026/03/11/anthropic-claudedisruptive-company-pentagon/ ("Dario helped make a pivotal finding about socalled AI-scaling laws that kicked off the current AI boom"). A plan described as having been drawn in scaling-laws graphs cannot have existed before January 23, 2020 — the date Amodei himself formally proved the scaling laws per Kaplan et al. The person who proved the scaling laws, who was present at OpenAI throughout the entire relevant period, has thereby confirmed through his own May 6, 2026 public statements that the integrated generative AI framework could not have existed in plan-graphable form in 2015. This is a second self-dating

admission, sourced entirely from Defendants' own personnel, that is presumptively reliable under *Daubert v. Merrell Dow Pharmaceuticals*, *Inc., 509 U.S. 579, 593–94 (1993)*, as it rests on peer-reviewed published papers with known authorship, known dates, and no disputed methodology.

As established in Section I of this brief, Brockman's April 22, 2026 public statement that OpenAI operated on a continuous technical plan since 2015 is irreconcilable with the peer-reviewed Nature study's confirmation that the integrated generative AI architecture first appeared in the global patent record after May 2018. See Floridi et al., Emergence of Generative AI in Global Patent Records, Sci. Rep. 15(1):45690 (2025). The Nature study satisfies every criterion for presumptive scientific reliability established by the Supreme Court: it has been tested, subjected to peer review and publication, employs a methodology with a known and disclosed analytical basis, and reflects the analysis of 172,489 global patent records. *Daubert v. Merrell Dow Pharmaceuticals*, *Inc., 509 U.S. 579, 59394 (1993)*. This irreconcilability eliminates the independent 2015-origin narrative as a matter of logic, not inference, and confirms that an external source – Plaintiff's May 29, 2018 specifications – introduced the integrated architecture into OpenAI's technical plan after 2015.

**First Irreconcilability – The Nature Study.**

31

The Nature study's confirmation that the integrated generative AI architecture first appeared in the global patent record after May 2018 is irreconcilable with a 2015 Napa plan that allegedly already encompassed that architecture. Floridi et al., Sci. Rep. 15(1):45690 (2025). ***Under Matsushita Electric Industrial Co. v. Zenith Radio Corp.***, ***475 U.S. 574, 587 (1986)***, where the factual record makes a non-movant's theory implausible, the non-movant "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." No evidence can make a 2015-origin theory plausible when peer-reviewed analysis of 172,489 global patents confirms the technology did not exist in 2015. ***Under Anderson v. Liberty Lobby***, Inc., ***477 U.S. 242, 248 (1986)***, a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." No reasonable jury confronted with this study could find for Defendants on independent origin.

**Second Irreconcilability – The Three-Step Self-Dating Proof.**

Brockman's own description of the three-step Napa plan – (1) solve reinforcement learning, (2) solve unsupervised learning, (3) gradually learn more complicated things – is independently self-defeating as a matter of documentary record. Copying in copyright law requires proof that the defendant had access to the plaintiff's work and that protected expression from that work appears in the

defendant's work. *Feist Publications*, *Inc. v. Rural Telephone Service Co.*, *499 U.S. 340, 361 (1991)*. Every OpenAI publication implementing each of Brockman's three plan steps postdates Plaintiff's May 29, 2018 disclosure: the unsupervised pre-training component (GPT-1) was published June 11, 2018 – thirteen days after Plaintiff's disclosure – implementing one component of the integrated framework; the reinforcement learning component was published in Berner et al., Dota 2 with Large Scale Deep Reinforcement Learning, arXiv:1912.06680 (OpenAI, Dec. 13, 2019); and the mathematical formalization of iterative scaling was published in Kaplan, McCandlish, Henighan, Brown, Chess, Child, Gray, Radford, Wu and Amodei, Scaling Laws for Neural Language Models, arXiv:2001.08361 (OpenAI, Jan. 23, 2020). Each paper was authored by OpenAI's own researchers, constituting non-deniable, date-stamped party admissions admissible under *Fed. R. Evid. 801(d)(2)(A) as statements of party-opponents* offered against OpenAI. A plan whose every documented fulfillment postdates an external disclosure is not a

pre-existing 2015 prediction; it is a retroactive narrative fatal to the independentorigin defense *under Anderson, 477 U.S. at 248.*


**Third Irreconcilability – The Amodei December 2018 Admission.**

33

The retroactive nature of the 2015-origin narrative is confirmed with exceptional precision by a second OpenAI paper co-authored by Dario Amodei, written six months and fifteen days after Plaintiff's May 29, 2018 disclosure. McCandlish, Kaplan, Amodei and OpenAI Dota Team, An Empirical Model of Large-Batch Training, arXiv:1812.06162 (OpenAI, Dec. 14, 2018), available at https://openai.com/index/how-ai-training-scales/. That paper covered all three components of Brockman's claimed 2015 plan simultaneously: supervised learning datasets (Step 2), reinforcement learning including Dota 2 (Step 1), and "even generative model training" (Step 3). Most significantly, its abstract states: "To our knowledge there is limited conceptual understanding of why these limits to batch size differ or how we might choose the correct batch size in a new domain." Id. (Abstract). This is an explicit admission by Amodei and his co-authors, in December 2018, that the foundational conceptual understanding underlying the scaling framework – the very framework Brockman claims was planned at a 2015

Napa BBQ – did not yet exist. If conceptual understanding was "limited" in December 2018 by the researchers who would later formalize it, it categorically could not have existed at a 2015 offsite. This admission is a statement by Defendants' own agent concerning a matter within the scope of his employment during the employment relationship, admissible as a party-opponent admission under ***Fed. R. Evid. 801(d)(2)(D). The paper satisfies every Daube***rt reliability

criterion: peer-indexed, publicly available, authored by named OpenAI researchers, and continuously cited in peer-reviewed literature through at least NeurIPS 2025. *Daubert, 509 U.S. at 593-94*

.

**Fourth Irreconcilability – The Core Memory Podcast and Uncontested Trial Testimony.**

The irreconcilable nature of the 2015-origin narrative is further exposed by Brockman and Altman's own joint public statements. In their May 5, 2026 Core Memory podcast – their first joint interview in ten years, published during the active trial in *Musk v. Altman* – Brockman publicly described the breaking point with Musk in August 2017: "Elon was like, you need majority equity. To be CEO, you need full control. Absolute control over OpenAI… That was the breaking

point." The AI Corner, Sam Altman and Greg Brockman Finally Talked (May 5, 2026). Both Brockman and Altman described the technology Musk sought to control as "a super-technology critical to humanity's future." Id. Each co-founder thereby manifested adoption and belief in the other's characterization of the technology's existence and value, making those statements admissible as partyopponent adoptive admissions against both under *Fed. R. Evid. 801(d)(2)(B).*

This characterization creates a fourth, independent irreconcilability. In August 2017, when Musk demanded absolute control, OpenAI had published no

35

unsupervised learning paper, no reinforcement learning paper, no scaling laws paper, and no integrated generative AI framework had appeared in the global patent record. See Radford et al. (GPT-1, June 11, 2018); Berner et al., arXiv:1912.06680 (Dec. 13, 2019); Kaplan et al., arXiv:2001.08361 (Jan. 23, 2020); Floridi et al., Sci. Rep. 15(1):45690 (2025). Two and only two conclusions are possible:

(a) The technology was not yet operational in August 2017, meaning Brockman's characterization of the 2017 control fight as being over "a super-technology critical to humanity's future" retroactively imports the post-2018 integrated architecture backwards into the 2017 narrative; or

(b) The technology existed in 2017 in undisclosed form, in which case OpenAI withheld an integrated generative AI framework from the public record between 2015 and 2018, and Plaintiff's May 29, 2018 disclosure is the first external description of a framework OpenAI already possessed and was concealing.

Both conclusions eliminate the independent-origin defense. Under conclusion (a), the 2015-origin narrative is a retroactive fabrication. Anderson, 477 U.S. at 248. Under conclusion (b), the technology's undisclosed pre-disclosure existence and subsequent concealment constitutes the institutional deception documented in Exhibit L and corroborated by former OpenAI board member

36

David McCauley's sworn trial testimony describing a "culture of lying and culture of deceit" at OpenAI's leadership level. See Business Insider, Sam Altman Had a Bad Day in Court (May 6, 2026).

Brockman's uncontested sworn testimony in *Musk v. Altman* further confirms the Fourth Irreconcilability. On cross-examination, Musk's counsel challenged

Brockman only on his unpaid donation obligation and financial entanglements, declining to contest the August 2017 meeting date, the demands made, the technology characterization, or Brockman's testimony that OpenAI's compute costs were $30 million in 2017, surging to $50 billion by 2026. See Business Insider, The 6 Biggest Revelations From Greg Brockman's Second Day of Testimony (May 5, 2026). The $30 million-to-$50 billion compute trajectory – a 1,667-fold increase driven by the post-2018 integrated architecture – is independent documentary confirmation that the architecture's operational scale explosion began after 2018. That testimony stands unrebutted in the federal trial record under *Fed. R. Civ. P. 56(c)(1)(A).*

### Judicial Estoppel

The 2015-origin narrative Defendants advance in this proceeding is clearly inconsistent with the timeline implied by Brockman's own sworn *Musk v. Altman*

testimony. *Under New Hampshire v. Maine*, *532 U.S. 742, 749-51 (2001)*, judicial estoppel applies where "a party's later position [is] 'clearly inconsistent' with its earlier position" adopted in a prior proceeding. The August 2017 control fight described under oath by Brockman – over technology for which no published

paper yet existed – is logically inconsistent with the claim that the integrated architecture was conceived and planned in 2015. Defendants cannot simultaneously maintain before Judge Gonzalez Rogers that the August 2017 technology justified absolute control, and maintain before this Court that the same technology was already fully planned in 2015, without implicating judicial estoppel under *New Hampshire v. Maine.*

**The Missing 2015 Plan Document – Adverse Inference.**

No documentary evidence of the 2015 Napa plan – no notes, no graphs, no emails, no contemporaneous records of any kind – has been produced in this proceeding or in *Musk v. Altman. Brockman's* own diary, authenticated and introduced in *Musk v. Altman*, contains entries from the founding period but contains no reference to a specific three-step technical plan. *Fed. R. Civ. P. 37*(e) authorizes an adverse inference where a party fails to take reasonable steps to preserve electronically stored information that should have been preserved in anticipation of litigation, and that failure results in prejudice to the opposing party.

38

Where the single most critical document in the defense – the 2015 Napa plan Brockman describes in detail but has never produced – does not appear in the trial record of either this proceeding or

the parallel federal proceeding in *Musk v. Altman* where OpenAI's entire founding history has been placed in issue, the factual basis for an adverse inference is established. The absence supports the inference that the plan did not exist in the form described, consistent with Plaintiff's access claim under Feist, 499 U.S. at 361, and the copying inference under *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000)*.

**Directed Verdict and Summary Judgment Convergence.**

The four irreconcilabilities established above – each sourced entirely from Defendants' own officers, Defendants' own published papers, and uncontested sworn trial testimony in a parallel federal proceeding – converge on a single legal conclusion that forecloses all paths to trial on the independent-origin defense.

Under *Fed. R. Civ. P. 50(a), a directed verdict is appropriate where* "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on the issue. Under *Fed. R. Civ. P. 56(a), summary judgment is appropriate where* "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Both standards are satisfied here on the independentorigin defense.

Defendants bear the burden of establishing independent origin as an affirmative defense. Feist, 499 U.S. at 361. *Under Celotex Corp. v. Catrett*, *477 U.S. 317, 32223 (1986)*, where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment is required. Defendants have produced no pre-2018 documentary evidence of the integrated architecture's existence – no patent applications, no internal technical specifications, no Napa plan document – while Plaintiff has produced a peer-reviewed study of 172,489 patents confirming the architecture first appeared in the global innovation record after May 2018. Floridi et al., Sci. Rep. 15(1):45690 (2025).

What Defendants possess instead is:

(1) Brockman's oral description of a three-step plan, unsupported by any produced document, every step of which was first implemented after

Plaintiff's May 29, 2018 disclosure, as proven by OpenAI's own published papers admissible under *Fed. R. Evid. 801(d)(2)(A)*;

(2) A $30 million-to-$50 billion compute cost trajectory confirming the architecture's operational scale explosion began after 2018, established by Brockman's own uncontested sworn trial testimony;

(3) A "super-technology critical to humanity's future" characterization applied in August 2017 to a technology for which no published paper, no patent, and no global patent record entry existed until after May 2018; and

(4) A "limited conceptual understanding" admission by their own VP of Research in December 2018, six months after Plaintiff's disclosure, confirming the foundational framework was still being built. arXiv:1812.06162.

*Under Scott v. Harris*, *550 U.S. 372, 380 (2007)*: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." The 2015-origin narrative is blatantly contradicted by four independent evidentiary sources, each originating from Defendants' own personnel and published work. No genuine dispute of material fact exists on independent origin. The directed verdict and summary judgment standards are both met. Judgment on the independentorigin defense is appropriate as a matter of law *under Anderson, 477 U.S. at 248; Matsushita, 475 U.S. at 587; Celotex, 477 U.S. at 322; and Scott, 550 U.S. at 380.*

**Ground Thirteen – The Brockman Institutional Deception Record (New).** As established in Section II of this brief, Brockman's November 2017 diary

entries – now a public federal court record through Judge Gonzalez Rogers' January 15, 2026 order in *Musk v. Altman*, *No. 4:24-cv-04722-YGR* – establish that OpenAI's co-founder contemporaneously acknowledged the organization's willingness to maintain false public narratives when commercially advantageous,

six months before Plaintiff's disclosure. Under *Fed. R. Evid. 404(b)(2) and Halo Electronics*, *579 U.S. at 103-05,* this evidence establishes the institutional intent, plan, and willfulness posture that was operational at the moment of Plaintiff's May 2018 disclosure, and directly supports maximum statutory damages under *17 U.S.C. § 504(c)(2).*

**Ground Fourteen** — The Clark Inadvertent Origination Admission (New). On May 6–7, 2026, Jack Clark, Co-Founder and Head of Policy at Anthropic, publicly stated that Anthropic is "taking this technology" toward cancer treatment and simultaneous multi-domain scientific advancement. See Mike Allen, Axios, May 6–7, 2026, https://canisgallicus.com/2026/05/07/axios-intelligence-explosion/. "Taking" is not originating language. *Under United States v. GAF Corp.*, *928 F.2d 1253, 1259 (2d Cir. 1991)*, a corporate officer's verbal description of his organization's relationship to the technology at issue is direct evidence probative of that relationship — here, a relationship of acquisition rather than creation. Clark's description of cancer treatment as the technology's application

directly mirrors Plaintiff's Exhibit E functional boundary marker specifying "a pill to make us live forever," for which zero prior art existed before May 29, 2018. Under *Ty, Inc. v.*

*GMA Accessories, Inc., 132 F.3d 1167, 1171 (7th Cir. 1997),* in the absence of a prior art pool from which similarity could otherwise be explained, this specification match is more probative of copying. Clark's admission constitutes the fourth independent officer admission across four named Defendant organizations, made without knowledge of any prior admission, each corroborating a distinct element of Plaintiff's framework — collectively satisfying the irrebuttable admission standard of *Mahlandt, 588 F.2d at 630,* and the inducement liability standard of MGM Studios, *Inc. v. Grokster*, Ltd., *545 U.S. 913, 930 (2005)*, as to Anthropic independently of every other theory of liability in this case.

**Ground Fifteen** — The Parallel Litigation Judicial Record (New). Since the January 29, 2026 dismissal of this action, courts in multiple jurisdictions have issued findings — on adversarial records, with Defendants represented by sophisticated litigation counsel — that directly corroborate the institutional copying practices Plaintiff's Verified Complaint alleges. *In Bartz v. Anthropic PBC* (N.D. Cal., June 23, 2025), U.S. District Judge William Alsup found that Anthropic built "a central library that contained millions of pirated books" and that

43

this storage was not fair use — after which Anthropic settled with authors on August

26, 2025. Reuters, Anthropic settles class action from US authors alleging copyright infringement (Aug. 26, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/anthropic-settlesclass-action-us-authors-alleging-copyright-infringement. In *In re OpenAI, Inc. Copyright Infringement Litigation, MDL No. 3143 (S.D.N.Y., Oct. 28, 2025),* a federal court denied OpenAI's motion to dismiss, holding that plaintiffs adequately alleged "OpenAI actually copied plaintiffs' text" and that "a reasonable jury could find that allegedly infringing outputs are substantially similar to plaintiffs' works." Reuters (Oct. 28, 2025), https://www.reuters.com/legal/government/openai-losesbid-dismiss-part-us-authors-copyright-lawsuit-2025-10-28/. *In GEMA v. OpenAI*, Case No. 42 O 14139/24 (Regional Court of Munich, November 2025), a court held that "responsibility lies with OpenAI as the operator" for "decisions on architecture and dataset selection" — the precise theory underlying Plaintiff's architectural framework claim. The institutional copying practices Plaintiff alleges are not speculative: they are judicially confirmed across three jurisdictions against the same Defendants named here. *Fitzgerald Publishing Co. v. Baylor Publishing*

44

*Co.*, *807 F.2d 1110, 1115 (2d Cir. 1986)* (prior infringement of the same type is probative of willfulness). *Halo Electronics, 579 U.S. at 103–05.*

**Ground Sixteen – The Brockman Consciousness of Guilt Proof.**

The Brockman Irreconcilability Proof carries a second, independent legal consequence beyond eliminating the independent origin defense. Brockman is not an uninformed commentator speculating about OpenAI's history. He is the cofounder and former President who personally built and oversaw the technical architecture from its inception. He knows – with certainty – what existed in OpenAI's technical plan in 2015 and what did not. His April 22, 2026 statement on **The Knowledge Project** that OpenAI has been pursuing "almost the technical plan" from the 2015 Napa offsite "for the past 10 years" is therefore not an innocent misremembering of organizational history. It is a knowing false statement about the origin of the integrated architecture – a statement whose only rational motive is suppression of the question of where that architecture actually came from, given that the peer-reviewed *Nature* study confirms through analysis of 172,489 global patents that the integrated generative AI framework did not exist in 2015 and first emerged in the global innovation record only after Plaintiff's May 29, 2018 disclosure. *See* L. Floridi et al., **Emergence of Generative AI in Global Patent Records,** Sci. Rep. 15(1):45690 (2025).

45

It is a "principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Products, Inc.*, *530 U.S. 133, 147 (2000)* (quoting *Wright v. West*, *505 U.S. 277, 296 (1992)*). Federal courts of appeals apply this principle directly to false exculpatory statements: "[I]t is reasonable to infer guilty knowledge from [the defendant's] false exculpatory statement." *United States v. Reyes*, *302 F.3d 48, 56 (2d Cir. 2002)*. An innocent party whose integrated architecture genuinely originated in 2015 has no motive to falsely claim a continuous 2015 origin for that architecture. The existence of the false claim is itself affirmative evidence that the true origin of the architecture is legally problematic. The only reason a co-founder who personally built the architecture would know the origin is legally problematic is if the architecture did not originate internally.

This Ground is independent of and cumulative to the Altman confession (Ground Eight), the Brockman Irreconcilability Proof (Ground Twelve), and the *Musk v' Altman* diary record (Ground Eleven). Brockman has now returned to the stand in *Musk v. Altman* to add "context" to his diary entries – not to deny them – personally authenticating under oath the very entries incorporated in Exhibit L. He is thereby locked in a position he knows is false. If his sworn trial testimony

repeats the 2015-origin formulation, he faces exposure under *18 U.S.C. § 1621.* If his sworn trial testimony contradicts the April 22, 2026 podcast statement, the public recording becomes impeachment material of the highest order before Judge Gonzalez Rogers. Either way, the consciousness-of-guilt inference is irrebuttable on this record, and this Court's *Rule 60(b)(6)* analysis must weigh it as affirmative evidence of culpability under *Reeves* and *Wright v. West*.

## V. THE DIRECTED VERDICT STANDARD IS MET ON EVERY ELEMENT AS A MATTER OF LAW

*Under Anderson v. Liberty Lobby*, Inc., *477 U.S. 242, 252 (1986)*, a directed verdict or summary judgment on liability is appropriate where "the evidence is so one-sided that one party must prevail as a matter of law." *Fed. R. Civ. P. 50(a). The fifteen grounds now before this Co*urt collectively satisfy that standard on every element of the copyright infringement claim under *17 U.S.C. § 501.* No reasonable jury, presented with this record, could find in Defendants' favor on any element.

On the element of valid copyright, Plaintiff holds two copyright registrations — Registration No. VA 2-341-896 (May 29, 2018) and Registration No. TXu 2-398742 (December 30, 2021) — each issued within five years of first publication.

Under *17 U.S.C. § 410©*, those registrations constitute *prima facie* evidence of the validity of the copyrights and the facts stated therein, creating a rebuttable presumption that shifts to Defendants the burden of disproving validity. *Broadcast Music, Inc. v. Hirsch*, *104 F.3d 1163, 1165 (9th Cir. 1997)*. The primary mechanism for rebutting that presumption — demonstrating that Plaintiff's work was drawn from prior existing sources — is foreclosed by 172,489 global patents confirming the prior art field was effectively empty before May 29, 2018. There is nothing for Defendants to identify as an alternative source. The *§ 410*(c) presumption stands unrebutted as a matter of the global scientific record, and no reasonable jury could find against Plaintiff on copyright validity.

On the element of access, the record presents multiple independent and converging lines of proof, any one of which would independently establish access under *Arnstein v. Porter*, *154 F.2d 464, 468 (2d Cir. 1946)*. Sam Altman abandoned the presidency of Y Combinator — then managing a $150 billion portfolio — nine months and ten days after Plaintiff's May 29, 2018 disclosure, to pursue OpenAI, at that time a zero-revenue nonprofit. No rational economic actor makes that sacrifice without transformative new information. Elon Musk served as OpenAI's co-founder and board member during Plaintiff's exact disclosure period and subsequently adopted Plaintiff's precise aggregated intelligence formulation — AI

48

will be smarter than "all humans combined" — with zero prior art for that phrase before Plaintiff's Exhibit B. Dario Amodei served as OpenAI's Vice President of Research from 2016 through 2021, personally overseeing GPT-2 and GPT-3 development — the precise systems that implemented Plaintiff's internet connectivity, prompt interface and universal scope specifications — before departing to found Anthropic and deploying the same architecture under the Claude name. Greg Brockman served as Co-Founder and President of OpenAI from 2015 through 2024, publicly acknowledging on April 22, 2026 that a continuous technical plan has governed OpenAI's operations for ten years — a plan whose post-2018 content the global patent record confirms could not have originated in 2015 without an external source. Plaintiff's copyright registrations are public records maintained in the Copyright Office's publicly searchable database, accessible without fee by any person — including the teams of intellectual property professionals at each named Defendant organization whose professional function includes identifying existing rights in technologies their companies adopt. Registration No. VA 2-341-896 was issued May 29, 2018 — the date of Plaintiff's original disclosure — and Registration No. TXu 2-398-742 was issued December 30, 2021, covering the expanded specifications of Exhibit B. Both registrations were issued by the United States Copyright Office in December 2025. Because Plaintiff's framework documents

49

were shared only with a limited group of identified witnesses and were never distributed to the public within the meaning of *17 U.S.C. § 101,* the works were unpublished at the time of registration. For unpublished works, the five-year window for *prima facie* presumptive validity under *17 U.S.C. § 410(c)* never commenced, and the December 2025 registrations carry the full *prima facie* presumptive validity the statute affords. See *Harper & Row Publishers, Inc. v. Nation Enterprises*, *471 U.S. 539, 553 (1985)* (unpublished works entitled to full copyright protection from moment of creation). Copyright protection attached to each framework document at the moment of its creation under *17 U.S.C. § 302(a)* — May 29, 2018 for Exhibit E and December 30, 2021 for Exhibit B — and has been continuous since those dates.

On the element of copying, the record presents what is almost certainly the most direct evidence of copying in any reported copyright case involving technology. Sam Altman, CEO of OpenAI, stated on camera during the TBPN podcast on October 10, 2025: "We also clone stuff that works, that's fine." YouTube: https://www.youtube.com/watch?v=OTJy7-tmheA, timestamp 21:43–22:15. *Under United States v. GAF Corp.*, *928 F.2d 1253, 1259 (2d Cir. 1991)*, an explicit voluntary admission by a corporate officer constitutes direct evidence of copying that eliminates any need for circumstantial proof, probabilistic analysis, or expert

50